# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM HENDERSON,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **1:18-CV-424-TFM-M** |
| | ) | |
| **MOBILE COUNTY BOARD OF** | ) | **JURY DEMAND** |
| **EDUCATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Jon C. Goldfarb
L. William Smith
Christina M. Malmat
Attorneys for Plaintiff

**OF COUNSEL:**
WIGGINS, CHILDS, PANTAZIS,
FISHER, & GOLDFARB, LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

# **TABLE OF CONTENTS**

**PAGES:**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Plaintiff's Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    Plaintiff's Employment History with Defendant . . . . . . . . . . . . . . . 2

     B.    Plaintiff Has Personally Witnessed Race Discrimination in Principal Selections and Assignment Decisions . . . . . . . . . . . . . . . . . . . . . . . 3

     C.    Defendant's Selection Procedures for Certified Administrative and Supervisory Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     D.    Plaintiff's Application for Theodore High School Principal Position  6

          (1).   Plaintiff Applies for Position of Principal of Theodore High School . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          (2).   Plaintiff Is the Top Candidate Following Panel Interview . . . . 7

          (3).   Superintendent Peek Conducts Additional Interviews After the Panel Recommends Plaintiff as the Top Candidate . . . . . . . . 11

          (4).   The Assistant Superintendents Ranked Plaintiff as the Top Candidate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     E.    Superintendent Peek Never Offered Plaintiff a Position at Clark Magnet School . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     F.    The EEOC Issues a Cause Finding . . . . . . . . . . . . . . . . . . . . . . . . . 14

     G.    Superintendent Peek Appoints Plaintiff as Principle of LeFlore Preparatory  School, a Majority African-American School . . . . . . . 15

III.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.   Plaintiff Has Established a Prima Facie Case of Race Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.   A Reasonable Jury Could Infer Pretext  . . . . . . . . . . . . . . . . . . . . . . 16

   (1).  Defendant Allowed the White Candidate to Bypass the Panel Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   (2).  Defendant Fabricated Scores For Menton and Plaintiff Purporting to Show that Menton Was Interviewed by the Panel and Scored Highest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   (3).  Defendant Created a False Document with Fabricated Scores and Submitted it Along with the Real Interview Scores to the Superintendent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.   Superintendent Peek Offered Pretextual Reasons for Selecting Denton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   (1).  Peek's Post-Hoc Explanation that Menton Performed Better on the Follow-up Interview is Devoid of Specificity and Incapable of Rebuttal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   (2).  The Superintendent's Explanation that a "New Broom" Was Needed Is Pretextual as Plaintiff Was Later Hired to Work at a Majority-Black School Where He Was Assistant Principle Just Four Years Prior  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I.      Introduction

Plaintiff was the highest-scoring candidate for the position of principal at Theodore High School, outperforming all other candidates on the panel interview that is required under Defendant's structured selection process. However, Defendant allowed Charles Menton, the successful white candidate, to bypass the panel interview, then fabricated interview scores to make it appear he had outperformed Plaintiff. Defendant also created a document that falsely showed Plaintiff scoring lower than he had, and even fabricated an interview score for Plaintiff from an individual who had not been present in his interview, purporting to show that this individual, Assistant Superintendent Eggleston, scored Menton higher than he scored Plaintiff. In fact, Eggleston had interviewed neither candidate. From this evidence, a reasonable jury could conclude that Defendant's reliance on a structure promotion process is "all a lie" and was used in this case as a pretext for discrimination.

A reasonable jury could further find that Superintendent Peek's reasons for preferring Menton to Plaintiff are false and a pretext for race discrimination, as she knew that Menton should never have had the opportunity to be considered by the superintendent because he had not undergone a panel interview. Peek was further aware that Defendant had fabricated panel interview scores for Menton and was unable to give specifics of how his performance in the interview with her was superior

to Plaintiff's. As to the asserted reason that she wanted to hire a principal with no experience at the school, the superintendent could not explain the reasoning behind this. Moreover, when Peek considered Plaintiff a year later for the job of principal at LeFlore Preparatory Academy,  a majority African-American school with only two white students, she had no problem with the fact that Plaintiff had just spent six years as assistant principle at LeFlore, leaving the school in 2013. A reasonable jury could infer that this newly asserted reason is a pretext for race discrimination.

Because a reasonable jury could find that Plaintiff's race was at least a motivating factor in his non-selection, summary judgment should be denied.

## II.    Plaintiff's Statement of Facts.

### A.    Plaintiff's Employment History with Defendant.

1.    Plaintiff graduated from the University of South Alabama with a degree in secondary education, social science composite in 1996. (Henderson 8:13-9:9). Plaintiff also has a master's degree in counseling, which he received in 2002. (Henderson 9:3-9). Plaintiff completed his administrative certification from the University of South Alabama in 2004. (Henderson 9:17-22). Plaintiff has an educational specialist degree or "AA certificate" in instructional leadership from the University of West Alabama, which he received in 2014. (Henderson 9:23-10:12).

2.    Plaintiff began teaching in the Mobile County Public School System in 1996.

(Henderson 10:20-23). Plaintiff did some of his student teaching at Davidson High School in 1996. (Henderson 20:3-8). He was employed full-time at Theodore High School from 1996 to 2002, teaching social studies and serving as the cross country and track and field coach. (Henderson 10:25-11:2). After completing his master's degree in 2002, Plaintiff was assigned to Spencer Elementary School as a guidance counselor from 2002-2004. (Henderson 11:3-10). During this time Plaintiff also served as an assessment team leader and achievement specialist. (Henderson 11:7-12).

3.     Next, in the summer of 2004 Plaintiff was assigned to Spencer as an administrative intern, a function similar to that of assistant principal, and remained in that position for one year. (Henderson 11:9-17).

4.     From 2005-2007 Plaintiff was the assistant principal at Mae Eanes Middle School. (Henderson 11:18-20). Plaintiff then spent six years, until 2013, as assistant principle at LeFlore Preparatory Academy. (Henderson 11:21-24). Plaintiff was assistant principal at Murphy High School from 2013-2017. (Henderson 11:25-12:2).

5.     Every school that Plaintiff has worked at as an administrator has improved during his tenure. (Henderson 43:1-8).

### B.     Plaintiff Has Personally Witnessed Race Discrimination in Principal Selections and Assignment Decisions.

6.     During his more than two decades of employment, Plaintiff personally witnessed that Defendant has never appointed an African-American to be principal at

3

a predominantly white high school, but appointed white principals at schools that had predominantly black populations. (Henderson 60:10-21; EX 3, PX 22). Not until after Plaintiff filed his EEOC Charge was a black principal appointed to a predominantly white school. (Henderson 60:19-21; Peek 103:6-104:14).

7.   Principal salaries are based on the size of the school. (Henderson 61:1-62:4; Peek 94:10-19). The largest high schools, including the largest predominantly black high schools, also have not had an African-American principal. (Henderson 61:1-62:4).

## C.   Defendant's Selection Procedures for Certified Administrative and Supervisory Positions.

8.   Defendant's selection procedures for the principal position at issue in this lawsuit set forth the following "Formal Steps to be used in Selecting Administrators to Fill Vacancies":

1. Determination made of administrative position vacancy.

2. Human Resources issues announcement of vacancy and posts /advertises the vacancy.

3. Human Resources accepts applications from interested individuals who are on the Eligible Candidate Roster (ECR). Current employees must complete the Alabama State Department of Education on -line Internal Employee Application and submit a resume. If the applicant is not a current MCPSS employee, he /she must complete the Alabama State Department of Education on -line application and submit a resume.

4. After posted deadline, Human Resources will submit eligible applicants to

the appropriate assistant superintendent.

5. The assistant superintendent in whose area the vacancy occurs reviews the applications and determines which applicants will be called for a face-to-face interview with a committee.

6. Committee interviews are held. In all cases, a minimum of three candidates are interviewed for each vacant position.

(EX 4, PX 1; Peek 14:1-19).

9.      The procedure further states, "For principal vacancies, an Assistant Superintendent for Academic Affairs will chair the interview committee which will be composed of

✓ Other Academic Affairs Assistant Superintendents
✓ A principal selected by the Assistant Superintendent who is chairing the committee
✓ Central office representative from Curriculum and Instruction
✓ A community or parent representative of the school where the vacancy occurs
✓ A representative from Human Resources"

(EX 4, PX 1; Peek 19:3-19).

10.      The procedures further state:

Each committee will meet at a time and a place determined by the presiding assistant superintendent to review the records of all persons to be interviewed, to develop interview question [sic], and to conduct the interviews. Each person interviewed will be asked the same questions and each answer will be assessed by the committee members using the same rubric or scoring guide.

All scores are tallied and ranked. The presiding assistant superintendent recommends a top candidate to the Superintendent in a letter giving the names of the interview committee, the date of the interview, and the names of all the candidates interviewed.

5

(EX 4, PX 1; Peek 20:6-21:12). The ranking of the candidates is based on the interview scores; whoever scores highest on the interview would be the top candidate recommended. (Peek 21:8-22:15).

11.     Under the written selection procedure, the superintendent then recommends to the Board of School Commissioners one candidate for approval. (EX 4, PX 1). There has been no occasion when Superintendent Peek made a recommendation to the Board for a principal or assistant principal position and the Board rejected it. (Peek 38:11-17).

12.     There is no provision in the written procedures for the Superintendent to conduct her own interviews. (Peek 23:13-24:1).

### D.     Plaintiff's Application for Theodore High School Principal Position.

#### (1)     Plaintiff Applies for Position of Principal of Theodore High School.

13.     In the first or second week of June 2016, Plaintiff spoke with Dr. Lynda Carroll, the assistant superintendent over Murphy High School, and told her that if a principal position was to come open at a high school he would like to be considered. (Henderson 22:7-13). Dr. Carroll then informed him that the current principal at Theodore High School had just resigned or was going to retire, and that if Plaintiff was interested, he should apply for the position. (Henderson 22:14-20).

6

14.     The retiring principal, Ronnie Powell, was white. (Peek 33:21-34:4). During Superintendent Peek's tenure, there has not been an African-American principal at Theodore, which was about seventy percent white students at the time. (Peek 34:13-19; EX 5, PX 9).

15.     The position was not posted online, so Dr. Carroll initially told Plaintiff to apply for the generic posting for high school principles; however, this also was unavailable. (Henderson 22:24-23:6). Plaintiff then emailed Superintendent Martha Peek and Dr. Foster, the school board member over Theodore, to express his interest in the position, attaching his resume. (EX 6, PX 2; Henderson 23:7-14). Superintendent Peek responded that she would let the assistant superintendents know to include Plaintiff on the list of those who should be interviewed. (Henderson 23:15-23).

16.     Plaintiff was then informed by Dr. Foster that the posting for the Theodore job was online, and Plaintiff submitted an online application. (EX 7, PX 3; EX 8, PX 5; Henderson 23:15-23; Peek 39:19-40:1).

17.     Plaintiff was qualified for the Theodore principal job. (Peek 113:9-14).

18.     After applying, Plaintiff received a phone call instructing him to report for an interview. (Henderson 24:14-24).

### (2)     Plaintiff Is the Top Candidate Following Panel Interview.

19.    The interview was a panel interview; the panelists were Dr. Linda Carroll, Sharon Magee, John Powell from human resources, Assistant Superintendent Phaedra Fox, and Ms. Hutto, a parent. (Henderson 25:1-7). The interview lasted approximately 45 minutes, with each of the panelists asking Plaintiff questions, taking notes, and scoring his responses. (Henderson 25:8-13).

20.    The interview schedule included eight candidates: Wendy Clanton, Regina Reese, Jennifer Sullivan, Craig Williams, William Henderson, Robert Murphy, Nelson Parker, and Wendell Ellis. (EX 9, PX 14). However, the interview schedule did not include Chip Menton, who was ultimately selected for the job, nor David Diaz, the other finalist. (Peek 69:3-23).

21.    Defendant produced two different summary interview score sheets, with Menton and Diaz  appearing on one of the summary score sheets and not the other, and different scores from certain of the panel interviewers on the two sheets. (EX 9, PX 14; EX 10, PX 15).

22.    Menton did not go through a panel interview for Theodore High in June of 2016; rather, his only recent interview was for the Denton Magnet School position in April 2016. (EX 11, PX 23).

23.    Similarly, David Diaz did not interview for Theodore High in June 2016; rather, his only recent interview was for Hankins Middle School on April 25, 2016. (EX 11,

8

PX 23).

24.     EX 9,  which includes only the candidates interviewed in June 2016, reflects

Magee giving Plaintiff a score of 24; by contrast, EX 10, which includes Menton and

Diaz in addition to the interviewed candidates, wrongly shows Sharon Magee giving

Plaintiff a lower score of 21. (EX 10, PX 15; EX 9, PX 14). Magee's handwritten

score sheet confirms that the score she assigned Plaintiff was 24, not 21. (EX 12, PX

11). Superintendent Peek had no explanation for this discrepancy. (Peek 77:12-21).

25.     Similarly, EX 9 reflects Plaintiff receiving a score of 23 from Cliff Allred,

while EX 10 shows an incorrect score of 20. (EX 9, PX 14; EX 10, PX 15). EX 12

confirms that the correct score should have been 23, not 20. (EX 12, PX 11). Again,

Superintendent Peek had no explanation. (Peek 78:9-12).

26.     Defendant has not produced handwritten interview scores from Reginald

Eggleston, a member of the interview panel listed on EX 10 but not EX 9. (EX 10, PX

15; EX 9, PX 14; EX 12, PX 11). Eggleston was not present in Plaintiff's panel

interview. (Henderson 25:1-7).

27.     The only scores Defendant produced from Eggleston for Menton were from an

interview for a different job that took place on April 25, 2016, with Eggleston

awarding Menton 15 points. (EX 13, PX 12). Peek confirmed that the April interview

notes were not for the Theodore job and that the April interview scores were not

comparable with the scores from the June interviews. (Peek 70:9-71:10).

28.     Eggleston was not present in Plaintiff's interview, yet EX 10 has Eggleston giving Plaintiff a score of 21, with Eggleston giving Charles Menton, the eventual selectee, a score of 23, even though Menton was never interviewed by the panel in June, 2016, and Superintendent Peek admitted the June and April scores were not comparable. (Henderson 25:8-13; Peek 70:9-71:10).

29.     Superintendent Peek testified that she should have been able to answer the questions about the discrepancies between EX 9 and EX 10 and the missing scores from Eggleston: "But I don't have the answer for them. I don't – I don't know." (Peek 81:6-12).

30.     On EX 9, which reflects the candidates who were actually interviewed in June 2016, Plaintiff received the highest interview score, with a point total of 130; next highest was Wendy Clanton, with a point total of 118, followed by Nelson Parker, with a point total of 112. (EX 9, PX 14).

31.     EX 10, which includes improperly low scores for Plaintiff as discussed above, has Plaintiff second among the candidates, with Charles Menton receiving a score of 152, Plaintiff receiving a score of 145, and David Diaz receiving a score of 144. (EX 10, PX 15). Again, however, Diaz and Menton were never interviewed by the panel that interviewed Plaintiff in June 2016. (EX 11, PX 23).

32.     Correcting for the incorrect scores attributed to Magee and Allred, and removing the two point differential resulting from the scores from Eggleston included on EX 10, Plaintiff should have received the highest score of 153. (EX 10, PX 15).

### (3)  Superintendent Peek Conducts Additional Interviews After the Panel Recommends Plaintiff as the Top Candidate.

33.     Following the interview, Plaintiff received a call from Superintendent Peek's office asking him to meet her in her office at nine o'clock the next morning. (Henderson 27:23-28:3).

34.     At the beginning of the meeting with the superintendent, Peek told Plaintiff "I just wanted to talk with you and a couple of other top candidates and try to determine who I'm going to recommend." (Henderson 34:10-15).

35.     Peek asked Plaintiff six or seven questions, including asking why he wanted to be the principal of Theodore High School and about his five-year plan. (Henderson 34:16-24). She asked Plaintiff how he would build academics and incorporate athletics into a cohesive program, and what he would do the first week on the job. (Henderson 34:24-35:3). She asked how he would make connections in the community, and how he would make use of the departing principle to establish himself before the current principal left the position. (Henderson 34:24-35:6).

36.     The interview lasted forty minutes. (Henderson 37:6-8). Superintendent Peek took notes, but Plaintiff provided more detail in his responses than is reflected in her

notes. (EX 14, PX 17; Henderson 37:2-5, 38:8-39:5). At the end of the interview, Peek told Plaintiff that she loved his five-year plan and his vision for the school, but that she was just "a cog in the wheel" of the decisionmaking process, and that the board would have to come to a consensus. (Henderson 39:8-16).

### (4)   The Assistant Superintendents Ranked Plaintiff as the Top Candidate.

37.     Immediately after the interview with the superintendent, Plaintiff spoke with the assistant superintendent, Dr. Carroll, who told him that she had recommended him for the position; that he was the most qualified for the position; that he had performed best in the interviews for the position; but that she did not have a lot of confidence that her recommendation would be followed. (Henderson 40:3-11). Dr. Carroll was crying as she told Plaintiff this. (Henderson 40:3-11).

38.     Plaintiff scored highest on the panel interview and was superior to the other candidates in work history, experience, and performance. (EX 9, PX 14; EX 15, PX 24; Henderson 42:10-44:3).

39.     Superintendent Peek admits that she knew Plaintiff had received the highest score and that she went against the recommendation of the interview panel. (Peek 125:13-127:2). Other than this case, Peek could not name a single occasion when she went against the interview panel and selected a candidate other than the top scorer on the panel interview. (Peek 126:6-23).

40.    Plaintiff spoke to his supervisor, Dr. Smith, who told him that he felt like Plaintiff had been overlooked and "done wrong"; Smith also told Plaintiff that Superintendent Peek had called him, that he'd put in a very favorable recommendation with her, and that he had been sure that Plaintiff would get the job. (Henderson 46:6-18).

**E.    Superintendent Peek Never Offered Plaintiff a Position at Clark Magnet School.**

41.    The afternoon of his interview with Superintendent Peek, Plaintiff was informed that he had not been selected. (Henderson 44:22-45:6). Once he received the result, Plaintiff emailed the superintendent to thank her for her time and ask her for any feedback she could give him to help him do better on the interview, but Peek provided no such feedback. (Henderson 45:7-46:2).

42.    Superintendent Peek offered the Theodore High School Job to Charles Menton, who is white, on June 30, 2016, the same day she interviewed Plaintiff. (EX 16, PX 18; Peek 85:9-8). The same day, she made the decision to offer Diaz the position at Hankins Middle School, the position Diaz had interviewed for in April 2016. (EX 17, PX 20; EX 11, PX 23; Peek 89:9-15).

43.    Peek claims that she called Plaintiff and offered him a position at Clark Magnet School, a predominantly black middle school; however, this is untrue. (EX 18, PX 21; Peek 57:19-58:16; Henderson 48:20-49:2). Rather, Peek called Plaintiff the following

Tuesday, in July 2016, and offered him a position at Chastang Middle School, a K-8 facility. (Henderson 48:25-49:2; 50:2-6).

44.    If Peek had offered Plaintiff the Clark position, he would have accepted it as a road to a senior high school principal position. (Henderson 49:13-22. 51:1-7).

45.    When asked "What did the school need that Mr. Henderson did not have?" Peek testified, "The school needed someone that had, you know, no connections to the school, that would come in -- the thing that comes to my mind is, you know, a new broom sweeps clean. But somebody who had come in and who had not been involved, there were long-time staff members there who had been there a number of years. And there just needed to be that positive feeling tone of someone who was, you know, brand new coming into that school." (Peek 114:4-16).

46.    However, this is not in writing anywhere, and when originally asked for her reasons after Defendant received Plaintiff's EEOC Charge, Peek wrote that Menton "had a stronger follow-up interview and particularly expressed a more robust focus on developing a balanced academic program at Theodore High School than the other two candidates." (Peek 114:20-115:19; EX 18, PX 21).

47.    Peek admitted that Menton had a lower level of education than Plaintiff. (Peek 118:22-119:3).

    **F.    The EEOC Issues a Cause Finding.**

14

48.     After investigating Plaintiff's Charge of Discrimination, the EEOC issued a cause determination, finding that "Examination of the evidence establishes that the Charging Party was qualified to perform the job responsibilities of the position and scored higher than the White male candidate when interviewed by a panel of several individuals. The Respondent's contention that the White candidate's interview was stronger was not supported by the evidence of record. Based on the foregoing evidence, I conclude there is reasonable cause to believe that Respondent denied the Charging Party a promotion to the position of High School Principal due to his race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended." (EX 15, Cause Finding).

### G.     Superintendent Peek Appoints Plaintiff as Principal of LeFlore Preparatory School, a Majority African-American School.

49.     In the summer of 2017, the year after the selection decision at issue in this case, Superintendent Peek appointed Plaintiff as principal of LeFlore Magnet High School, the position he currently holds, a school with 838 African American students and two white students. (Henderson 12:3-5; 52:25-54:2; Peek 128:9-11; EX 3, PX 22).

50.     Plaintiff had recently spent six years as assistant principal at LeFlore, leaving the school just four years earlier in 2013. (Henderson 11:21-24).

### III.     Argument

Mr. Henderson brings a single claim of race discrimination arising from his

15

non-selection to the position of principal at Theodore High school in the summer of 2016.

### A. Plaintiff Has Established a Prima Facie Case of Race Discrimination.

To establish a prima facie case of discrimination based on a failure to promote, the plaintiff may show that (1) he belonged to a protected class; (2) he was qualified for and applied for the position; (3) he was rejected; and (4) the position was filled by someone outside of the protected class. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).

Plaintiff has established a prima facie case because he is African-American, he applied for and was qualified for the position of principal at Theodore, and Defendant awarded the position to Charles Menton, who is white.

### B. A Reasonable Jury Could Infer Pretext.

A reasonable jury could further infer that the reasons Defendant has given for selecting Denton over Plaintiff are a pretext for race discrimination, as Defendant allowed Charles Menton, the white candidate, to bypass the panel interview; Defendant then fabricated panel interview scores for Menton and Plaintiff to make it appear both that he had undergone a panel interview and that he had outperformed Plaintiff. "An employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286,

16

1299 (11th Cir. 2006). Allowing a reasonable jury to infer the ultimate fact of race discrimination, a jury could find that Defendant intentionally deviated from its written policies to benefit the white candidate, Menton, as explained below.

### (1)   Defendant Allowed the White Candidate to Bypass the Panel Interview.

Defendant's policies state that "[e]ach person interviewed will be asked the same questions and each answer will be assessed by the committee members using the same rubric or scoring guide," and that "the presiding assistant superintendent recommends a top candidate to the Superintendent in a letter giving the names of the interview committee, the date of the interview, and the names of all the candidates interviewed." (EX 4, PX 1; Peek 20:6-21:12). Plaintiff went through the panel interview as required and obtained the highest score of those candidates who were interviewed in June 2016, as reflected on EX 9 and EX 11. However, as reflected by the absence of Menton's name on EX 9, Defendant did not require the white candidate, Charles Menton, to be interviewed. Rather, EX 11 shows that Menton interviewed unsuccessfully in April for the Denton Magnet School position, and was not required to interview again in June for the Theodore High position that Plaintiff applied for. (EX 11, PX 23). Nonetheless, Defendant created falsified interview scores showing that Menton was the top performer on the interviews and forwarded his name to the superintendent. (EX 10, PX 15).

17

This evidence allows a reasonable jury to infer that Denton was pre-selected for the position, with Defendant manipulating its selection policies, allowing Denton to bypass the panel interview, and fabricating scores to make him appear to be the top candidate. As stated by another district court, "while preselection does not necessarily establish pretext, when an employer's proffered legitimate, nondiscriminatory reason is that it did not engage in preselection but instead used a standardized hiring process, and the employee offers evidence that this is all a lie, a genuine dispute is created." *Williams v. Georgia Public Safety Training Ctr.*, 2013 U.S. Dist. LEXIS 119001, 2013 WL 4505816, *5 (M.D. Ga. Aug. 22, 2013). Here, allowing an inference of pretext, a reasonable jury could find that Defendant's purported reliance on a standardized, seemingly objective selection process was "all a lie."

> **(2)   Defendant Fabricated Scores For Menton and Plaintiff Purporting to Show that Menton Was Interviewed by the Panel and Scored Highest.**

In addition to not requiring Menton to submit to the panel interview, Defendant went further and falsified scores for him, making it appear that Menton had interviewed with the other candidates and that he had scored the highest, when in fact Plaintiff had scored the highest on the panel interview. First, putting to rest any argument that Defendant was justified in using scores from a prior interview, the superintendent admitted that the scores from Menton's interview for the Hankins

Middle School job in April were not comparable with the scores for Plaintiff's June interview for the Theodore High position. (Peek 70:9-71:10). Showing that Menton's score on EX 10 were fabricated, the only scores that Defendant produced from Eggleston for Menton were from an interview for a different job that took place on April 25, 2016, with Eggleston awarding Menton 15 points. (EX 13, PX 12). However, the score reflected from Eggleston for Menton on EX 10 is 21. (PX 15). Similarly, Defendant falsified an interview score from Eggleston for Plaintiff that was lower than the false score from Eggleston for Menton; but Eggleston was not even present in Plaintiff's interview. (Henderson 25:1-7). A reasonable jury could infer that rather than simply use a prior interview score for Menton, Defendant intentionally fabricated numbers for Menton to give the false impression that he had outperformed Plaintiff in Defendant's structured selection process. (EX 10, PX 15).

### (3)   Defendant Created a False Document with Fabricated Scores and Submitted it Along with the Real Interview Scores to the Superintendent.

Defendant next created a summary document, EX 10, summarizing the scores for all the candidates and purporting to show that Denton had significantly outperformed Plaintiff on the panel interview. In addition to fabricating scores for Menton, EX 10 also shows that Defendant falsified certain of Plaintiff's scores, lowering them in comparison with the scores assigned to Menton. EX 10 has Plaintiff

scoring seven points lower than Menton, with Menton receiving a total score of 152 and Plaintiff receiving a total score of 145. However, EX 10 reflects Sharon Magee giving Plaintiff a score of 21, and EX 12, Magee's handwritten score sheet, confirms that the true score she assigned Plaintiff was 24, not 21. (EX 12, PX 11; EX 10, 15). Similarly, EX 10 reflects Plaintiff receiving a score of 20 from Cliff Allred, but EX 12 confirms that the correct score should have been 23. (EX 12, PX 11; EX 10, 15). A reasonable jury could further conclude that all of the scores included for Menton on EX 10 were fabricated, as Menton was not interviewed in June, and Peek admitted that the scores from Menton's interview for the Hankins Middle School job in April were not comparable with the scores for Plaintiff's interview for the Theodore High School position. (Peek 70:9-71:10; EX 11, PX 23).[1]

The manipulated interview scores falsely showed Menton significantly outperforming Plaintiff on the panel interview. Allowing an inference that Defendant knowingly relied on the falsified document, and that no innocent mistake occurred, EX 9 and EX 10 are each initialed by the three assistant superintendents and stamped received by the superintendent's office at exactly the same date and time, making clear that individuals on both sides were aware that Defendant was keeping, in effect, two

---

[1]Finally, Eggleston was not present in Plaintiff's interview, yet EX 10 has Eggleston giving Plaintiff a score of 21, with Eggleston giving Charles Menton, the eventual selectee, a score of 23, even though Mention was not interviewed in June, 2016. (Henderson 25:8-13; EX 11, PX 23).

sets of documentation regarding the interview process: one honest record, EX 9, and one doctored record, EX 10, with the latter falsely making Menton appear to have undergone an interview and to have been the superior candidate. Superintendent Peek knew that the process was being manipulated in Menton's favor because she received copies of both documents. A jury could rely on these intentional manipulations of an ostensibly objective selection process to find Defendant's explanation of its ultimate decision "unworthy of credence," and also to find for Plaintiff on the ultimate fact of discrimination: as stated by the Supreme Court, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). Similarly, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1529 (11th Cir. 1997) (internal quotes omitted). Based on the mendacity revealed by these documents, this is a case where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

21

C.    **Superintendent Peek Offered Pretextual Reasons for Selecting Denton.**

Superintendent Peek has offered two different explanations for choosing Denton over Plaintiff despite Plaintiff's superior objective qualifications in the areas of education and experience, and despite his superior performance on the panel interview. Each of the reasons offered by the Superintendent either fails to meet Defendant's burden of articulation or is false and a pretext for race discrimination, as discussed below.

(1)    **Peek's Post-Hoc Explanation that Menton Performed Better on the Follow-up Interview is Devoid of Specificity and Incapable of Rebuttal**.

In response to the EEOC's query, Peek reported that Menton "had a stronger follow-up interview and particularly expressed a more robust focus on developing a balanced academic program at Theodore High School than the other two candidates." (Peek 114:20-115:19; EX 18, PX 21). However, as stated above, Menton should never have been given the opportunity to interview with the superintendent, as he was improperly allowed to bypass the panel interview stage of the process, and was therefore not among the top candidates. Peek knew this because she received both EX 9 and EX 10. Pretext is shown by Peek disregarding her written policies and interviewing Menton as a finalist; a reasonable jury could also infer pretext because no witnesses other than Peek and each candidate were present, and Peek's post-hoc

22

reason for preferring Menton to Plaintiff is not in writing anywhere. (Henderson 37:2-5, 38:8-39:5). Moreover, Peek's typed notes do not accurately reflect Plaintiff's answers, as Plaintiff provided more detail in his responses than is reflected in the summary notes that were provided to the EEOC. (EX 14, PX 17; Henderson 37:2-5, 38:8-39:5).

More fundamentally, this reason fails to meet Defendant's burden of articulation because the vagueness of the reason denies Plaintiff the opportunity to meet and rebut the reason and show pretext, as the idea that Menton had a "more robust focus" smacks of jargon and lacks specifics. Because Peek failed to provide details, Defendant has failed to meet its burden of "articulat[ing] a nondiscriminatory reason with 'sufficient clarity' to afford the employee a realistic opportunity to show that the reason is pretextual." *Increase Minority Participation by Affirmative Change Today, Inc. v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (quoting *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)).  A reasonable jury could conclude that Defendant's reliance on this overly subjective reason is a "vehicle" for what is in truth a "race-based decision[]." See *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) ("we have emphasized that subjective criteria can be ready vehicle for race-based decisions…")

      **(2)**    **The Superintendent's Explanation that a "New Broom" Was Needed Is Pretextual as Plaintiff Was Later Hired to Work at**

23

**a Majority-Black School Where He Was Assistant Principal Just Four Years Prior.**

In her deposition, when asked "[w]hat did the school need that Mr. Henderson did not have?" Peek testified, "The school needed someone that had, you know, no connections to the school, that would come in -- the thing that comes to my mind is, you know, a new broom sweeps clean. But somebody who had come in and who had not been involved, there were long-time staff members there who had been there a number of years. And there just needed to be that positive feeling tone of someone who was, you know, brand new coming into that school." (Peek 114:4-16).

However, in her deposition Peek could not explain why "a new broom" was needed at Theodore, or what advantage it would be to the school to have a principal who had never worked there, making this asserted reason "unworthy of credence." *Reeves,* 530 U.S. at 147. When asked "[w]hat problems did Mr. Henderson have at the school that indicated to you that ... he didn't need to be there, a clean sweep?" Peek answered, "I don't know that there were any problems there ... He had just been there before, I think. And you know, he had possibly known some of the people there. I don't think there were any problems." (Peek 116:9-20). However, Plaintiff had not worked at Theodore since 2002, over fourteen years prior to the selection decision at issue, when he taught social studies and served as the cross country and track and field coach. (Henderson 10:25-11:2). Based on Peek's inability to explain why it would be

a problem for Plaintiff to return to the school after such a long time, a reasonable jury could view this reason as a pretext for discrimination.

Additionally supporting an inference of pretext, a "new broom" only seems to have been required for Superintendent Peek when she was evaluating Plaintiff as a black candidate applying for a principal job at a predominantly white school. Making a stark contrast with Peek's reasoning regarding the Theodore job, when Peek considered Plaintiff a year later for the job of principal at LeFlore Preparatory Academy, a majority African-American school with only two white students, she had no problem with the fact that Plaintiff had recently spent six years as assistant principal at LeFlore, leaving the school four years earlier in 2013. (Henderson 11:21-24). From this evidence, a reasonable jury could infer that Peek's testimony regarding the need for a "new broom" is pretext, and that her real motivation was the desire not to appoint an African-American principal to lead a majority-white school.

## IV.    Conclusion.

Based on the above arguments, authorities, and evidence, Defendant's motion for summary judgment should be denied.

Respectfully submitted,

 /s/ L. William Smith
Jon C. Goldfarb
L. William Smith
Christina M. Malmat

25

Counsel for Plaintiff

**OF COUNSEL**:
WIGGINS, CHILDS, PANTAZIS,
FISHER, & GOLDFARB, LLC.
The Kress Building
3011 9th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been properly served via the Court's ECF system to the following counsel of record:

K. Paul Carbo, Jr.
THE ATCHISON FIRM, P.C.
3030 Knollwood Drive
Mobile, Alabama 36693
251-665-7200
251-665-7250


on this the 20th day of September, 2019.


 /s/ L. William Smith
OF COUNSEL

26